IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 19 CR 50026 |
| LUIS ALFREDO DELACRUZ, | ) | Judge Philip G. Reinhard |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **LUIS ALFREDO DELACRUZ' MOTION TO SUPPRESS STATEMENTS**

NOW COMES Defendant, LUIS DELACRUZ, through his counsel, VIVIANA RAMIREZ, and JOSHUA B. ADAMS, pursuant to Fed. R. Crim. P. 12(b) and 47(b), and respectfully requests that this Honorable Court conduct an evidentiary hearing to suppress from the introduction into evidence statements Mr. DelaCruz made to law enforcement officers while in custody. In support of his motion, Mr. DelaCruz states the following.

I. BACKGROUND

According to investigation reports turned over by the government, on June 1, 2018, Department of Homeland Security agents interviewed Mr. DelaCruz at his home in Dekalb, Illinois. While Agent Nugent styled this a "non-custodial" interview, agents took positions at the front and rear entrances of Mr. DelaCruz' home and blocked the street in front of his residence with police cars. The agents had ballistic vest, sidearms and identified as law enforcement officers.

1

Agents ordered Mr. DelaCruz to sit at his kitchen table and showed him a search warrant for his business, Alfredo's Iron Works. Agents did not obtain a search warrant for his home. Rather, agents asked Mrs. DelaCruz to enter the home to interrogate Alfredo. Agent Nugent's report is silent as to whether any of the officers showed Mrs. DelaCruz the search warrant for the business or said they wanted to arrest her husband.

Despite the notation in Agent Nugent's report that this had been "non-custodial", agents never told Mr. DelaCruz he could terminate the interview. More importantly, the report is silent as to the agents stating the hallmark of a non-custodial interview; that the individual is free to leave.

Once agents had Mr. DelaCruz sit at his kitchen table, they began their interrogation. The first thing agents told Mr. DelaCruz was that they had a search warrant for his business related to alien smuggling and involuntary servitude. At that interview, Mr. DelaCruz made incriminating statements the government intends to use in its case in chief against him.

## II. LEGAL ANALYSIS

1. Applicable law

Before law enforcement officers can interrogate a suspect in custody, they must inform the individual of his *Miranda* rights. *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018)(citing *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009)). If the individual "invokes his rights, the officers must cease their questioning." *Id.*

2

Whether an individual is in custody is an objective analysis. *See J.D.B. v. North Carolina*, 564 U.S. 261, 270. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.DB.,* 564 US at 270; quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

Instead of creating a list of specific factors to check off, the Supreme Court has "required police officers and courts to 'examine all of the circumstances surrounding the interrogation,' *Stansbury,* 511 U.S., at 322, 114 S.Ct. 1526, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave. *J.D.B.*, 564 U.S. at 272.

The benefits of an objective standard enable courts to create uniform standards of the definition of "custody." "By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave, the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular

3

traits affect each person's subjective state of mind." *J.D.B.*, 546 U.S at 271, quoting *Berkemer v. McCarthy*, 468 U.S. 420, 442 (1984).

The Seventh Circuit has found that to determine whether someone is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *U.S. v. Pelletier*, 700 F.3d 1109, 1114 (7th Cir. 2012); citing *Howe v. Fields*, 565 U.S. 499, 508 (2012).

The Seventh Circuit stresses that "we must still ask an additional question: 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Pelletier*, 700 F.3d at 1114-1115. With these principles in mind, we turn to Mr. DelaCruz' encounter with law enforcement on June 1, 2018.

  2. Law enforcement placed Mr. DelaCruz in custody for purposes of *Miranda*.

Despite HSI Agents' notation on the top of the report of interview, agents placed Mr. DelaCruz in custody while at his home. When agents first arrived, they encountered Mrs. DelaCruz outside of her home. They asked to speak to Mr. DelaCruz but insisted that "he was not in any trouble, don't worry." Aff. of M. DelaCruz, attached as Ex. A. It is important to note at the same time agents arrived at the DelaCruz home, other agents were simultaneously executing a search warrant at the business, and at Mr. DelaCruz's mother's home. Agents never sought nor obtained a search warrant for Mr. DelaCruz's house.

4

Once Mrs. DelaCruz went inside to alert her husband, at least four agents followed her into her home. She noticed at least one agent go around the back of the home. Ex. A. She later saw several agents standing outside her backdoor while looking out the kitchen window. *Id*. When Mr. DelaCruz emerged from his bedroom, he sat at the kitchen table with three other agents and his wife. *Id*. Most importantly, Mrs. DelaCruz observed an agent standing in front of the front door of the home and at least one agent's firearm was visible. *Id*.

Notably, the DelaCruz home is not large by any means. It is 14 feet from the front door to the kitchen. The kitchen itself is only 11 feet wide by 15 feet long. The kitchen table where agents sat Mr. DelaCruz takes up a large portion of the space.

As agents began to interrogate Mr. DelaCruz, nobody informed him that he could leave at any time or terminate the interview. Based on the report tendered by the government, agents were dressed in ballistic vests with police markings on them. There was no doubt that these were law enforcement officers intent on obtaining information from Mr. DelaCruz.

From an objective standard, Mr. DelaCruz was not free to leave or terminate the interview. Agents informed him that they were executing a search warrant on his business at the same time as their visit to Mr. DelaCruz' home. Moreover, based on reports tendered by the government, agents conducted surveillance on both his home and the Iron Works factory prior to the June 1 encounter. Based on agents conduct prior to, and during this interrogation, there

were no set of circumstances in which the officers would have not arrested Mr. DelaCruz.

Perhaps the most significant fact from the June 1, 2018 encounter is that officers blocked both the front and back doors of the house. Objectively, this is to ensure Mr. Delecruz could not leave. Officers arrived early in the morning while Mr. DelaCruz was still in pajamas. Officers sat around the kitchen table with him and informed him they were also searching his place of business. At various points during the interrogation, at least one officer raised his voice. The reasonable person sitting in Mr. DelaCruz' position would not fairly believe he could either tell agents to leave the home or terminate the interrogation at his discretion.

Nor is the agent's classification of this interaction as a "non-custodial interview" determinative of this meeting. If that were the case, agents could remove their *Miranda* obligations simply by their subjective classification of an interview as "non-custodial." Besides the point, this is a legal conclusion. One that officers are not in a position to decide. That is left for the courts.

III. <u>CONCLUSION</u>

WHEREFORE, Mr. DelaCruz respectfully requests that this Honorable Court conduct an evidentiary hearing and suppress from the introduction into evidence statements Mr. DelaCruz made to law enforcement officers while in custody.

Respectfully submitted,


/s/Joshua B. Adams
Joshua B. Adams
Counsel for Mr. DelaCruz

/s/ Viviana Ramirez
Viviana Ramirez
Counsel for Mr. DelaCruz


Joshua B. Adams
LAW OFFICES OF JOSHUA B. ADAMS, P.C.
53 W. Jackson Blvd., Suite 1515
Chicago, IL 60604
(312) 566-9173

Viviana Ramirez
RAMIREZ LAW
408 N. Lake St.
Aurora, IL. 60506
(630)340-3391
Ardc# 6298913
viviana@vramirezlaw.com